2026 IL App (1st) 251573
Opinion filed April 20, 2026
Third Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* Mo. J., Me. J., My. J., and Ma. J., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 20 JA 1535, 20 JA 1536, |
| | ) | 20 JA 1537 & 20 JA 1538 |
| v. | ) | |
| | ) | |
| T.M., | ) | Honorable |
| | ) | Lisa M. Taylor, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Martin and Justice Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1    The State petitioned to terminate the respondent mother's parental rights on the basis of unfitness for (1) failure to demonstrate a reasonable degree of interest, concern, or responsibility for the children and (2) failure to make reasonable progress toward the children's return to her care within several nine-month periods following their neglect adjudication.

¶ 2    Two days before the termination trial, the mother's appointed attorney filed a motion to withdraw, citing the mother's lack of communication, cooperation, and collaboration. This was

the mother's fifth attorney during the pendency of these proceedings, and the trial court had already informed the mother that additional counsel would not be appointed. The trial court granted the attorney's motion to withdraw but required this attorney to serve as the mother's standby counsel. Moreover, the termination trial commenced that same day. Thereafter, the court granted the State's petition, terminating the mother's parental rights.

¶ 3       On appeal,[1] the mother argues that the trial court violated her statutory right to counsel and denied her due process when the court granted counsel's motion to withdraw and compelled the mother to proceed to trial that day without counsel. The mother also argues the trial court's finding that termination of her parental rights was in the children's best interest is not supported by sufficient evidence.

¶ 4       For the reasons that follow, we affirm the judgment of the circuit court.[2]

---

[1]This appeal is subject to expedited procedures under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Paragraph (a)(5) of Rule 311 requires us to issue our decision within 150 days after the filing of the notice of appeal, except where good cause is shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, the notice of appeal was filed on August 13, 2025, and the amended notice of appeal was filed on August 20, 2025. Consequently, we would have been required to issue our decision by January 12, 2026.

However, the deadlines for respondent to file supplements to the record and for the parties to file their briefs with this court were extended. Specifically, supplements to the record were allowed on September 17, 2025, September 19, 2025, and October 6, 2025, and respondent sought and received one extension of time to file the appellant's brief, which was filed on October 14, 2025. Thereafter, the petitioner sought and received three extensions of time to file each of the appellees' briefs. Specifically, the Office of the Cook County Public Guardian filed its brief on February 24, 2026, and the Office of the Cook County State's Attorney filed its brief on February 26, 2026. Thereafter, respondent filed her reply brief on March 4, 2026.

Under these circumstances, we find good cause for issuing our decision after the 150-day deadline contemplated by Rule 311(a)(5).

[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 5                                    I. BACKGROUND

¶ 6     The mother and Mr. J. are the minors' parents. Mr. J.'s parental rights to the minors were also terminated during the proceedings below. He is not, however, a party to this appeal.

¶ 7     The mother's four children—Mo., born in 2011; Me., born in 2014; My., born in 2016; and Ma., born in 2017—were taken into protective custody by The Department of Children and Family Services (DCFS) on November 10, 2020, after the mother failed to comply with DCFS services designed to prevent children from entering the foster care system. On November 13, 2020, the State filed petitions for adjudication and temporary custody for each of the children, alleging they were abused and neglected. At the temporary custody hearing held that day, the court appointed the public defender to represent the mother and appointed the Cook County Public Guardian as the attorney and guardian *ad litem* for the children. The court entered temporary custody orders without prejudice and granted the mother visitation supervised by DCFS or its assigns.

¶ 8     On November 18, 2020, the court entered temporary custody orders with prejudice to all parties. The court continued to allow the mother supervised visits with the children. The court also ordered court-appointed special advocates (CASA) for the children. The court vacated the public defender's appointment for the mother on November 18, 2020, but reappointed the public defender to represent her on December 16, 2020. On February 24, 2021, the public defender filed a motion to withdraw as counsel, stating that the mother's course of conduct rendered "it unreasonably difficult for [counsel] to carry out the employment effectively." The court granted the motion on March 8, 2021, and appointed bar attorney Rodney Stewart to represent the mother on March 22, 2021.

¶ 9       The court held the adjudication hearing on June 28, 2021, and made findings of neglect by injurious environment. At the disposition hearing on July 16, 2021, the court found that the mother and Mr. J. were unable to care for the children, found that it was in the children's best interest to remove them from their parents' custody, and placed them in DCFS guardianship. The court gave the agency discretion to begin unsupervised day visits for the mother.

¶ 10      On July 16, 2021, the court held a permanency planning hearing and set the initial permanency goal of return home within 12 months, noting that the mother had not made substantial progress toward the children's return home. At a second permanency hearing on April 22, 2022, which the mother attended by Zoom, the mother's attorney, Stewart, was not in attendance. The court asked the mother if she wanted a new attorney to be appointed to her since Stewart had also missed the prior court date. The mother agreed to have another lawyer, and the court vacated Stewart's appointment and appointed attorney Gilbert Schumm.

¶ 11      The court continued the goal of the children returning home within 12 months at permanency hearings conducted on May 25, 2022, December 14, 2022, and May 22, 2023, each time finding that the mother had not made substantial progress toward the return home goal. On March 11, 2024, private attorney Nathaniel Holcomb of the Chicago Legal Exchange filed an appearance on behalf of the mother.[3] At the May 24, 2024, permanency planning hearing, the court changed the goal to substitute care pending court determination on termination of parental rights (TPR). The court noted that all the children were in pre-adoptive homes and the mother had made

---

[3]It is unclear from the record when attorney Schumm withdrew as counsel, as there is no order to that effect.

no progress towards the return home goal since the start of the case and visits were inconsistent. The court also entered a new visitation order, allowing the mother only supervised visitation.

¶ 12     Attorney Holcomb filed a motion to withdraw as the mother's counsel on October 3, 2024, citing irreconcilable differences and a breakdown of the attorney-client relationship. At the November 25, 2024, hearing, the court granted attorney Holcomb's motion and released him as counsel. The court then briefly summarized the mother's history of previously discharged attorneys, including Holcomb's withdrawal for her failure to pay him. The court admonished the mother as follows:

> "I am going to get you one additional attorney, and that's going to be it, because the delay with the issue and [*sic*] you and your attorney is slowing down this case, and that means I as the judge am not acting in the best interest of your children, which is my job."

The court then instructed the State to file its TPR petitions, which were delayed by the uncertainty of the mother's legal representation. The court appointed bar attorney Kat Delgado to represent the mother and placed them in a Zoom breakout room after the hearing concluded. The mother never objected to Holcomb's withdrawal, Delgado's appointment, or the court's admonishment that Delgado would be the last attorney appointed by the court.

¶ 13     The State filed motions to permanently terminate the mother's parental rights on November 25, 2024, alleging grounds (b) (failure to demonstrate a reasonable degree of interest, concern, or responsibility for the children) and (m) (failure to make reasonable efforts or progress for the children's return), as enumerated in the Adoption Act (750 ILCS 50/1(D)(b), (m) (West 2024)). On May 13, 2025, the State filed its ground (m) pleading, alleging four nine-month periods during which the mother failed to make reasonable efforts or progress.

¶ 14   At the first TPR status hearing on January 22, 2025, attorney Delgado appeared on behalf of the mother, who was not present. The State asked to proceed expeditiously to trial, as the case had been significantly delayed by the parties requesting new attorneys. On March 20, 2025, Delgado appeared on behalf of the mother, who again was not present. The court heard testimony from both foster parents, who are maternal aunts, and DCFS caseworker Tiffany Heard regarding services for the children and visitation with Mr. J. Each attorney had an opportunity to ask additional questions or raise any additional concerns.

¶ 15   At the May 30, 2025, status hearing, both attorney Delgado and the mother were present remotely. The court admonished the mother that she must be alone when appearing remotely. At the court's inquiry, Delgado stated she had no objection to the admission of the CASA report or to the entry of the proposed case management conference order. The court then noted that the trial was set for an in-person court date, and the mother stated that she was able to appear in court in person on that date.

¶ 16   The mother was given leave to address the court and stated she had not had "any contact with anybody, pretty much, until [she] got an e-mail from a lady named Kat in April of this year. In January—." The court interrupted the mother, offered to put her in a Zoom breakout room with her attorney, and attempted to explain the rules because the court did not want to speak to a represented litigant without permission from the attorney. The mother said that she wanted to speak directly to the court and complained that she "never get[s] the respect." The mother then dropped off from the Zoom conference. Caseworker Heard was sworn and briefly testified regarding the status of 14-year-old Mo.'s therapy. When the court inquired if counsel had any questions or concerns, Delgado said no, other than to note that the mother had dropped off the Zoom

conference. The court instructed Delgado to give the mother the court's address, so she could appear in person for the June 26, 2025, TPR hearing regarding unfitness. Two days before the June 26, 2025, unfitness hearing, Delgado filed a motion for leave to withdraw as counsel, stating that she was unable to effectively represent the mother at the hearing due to lack of communication and cooperation.

¶ 17    On June 26, 2025, the case was before the court for a hearing on the termination petitions for all four children. Attorney Delgado, the assistant State's attorney (ASA), the assistant Public Guardian (APG), and Mr. J.'s counsel were present in the courtroom. The mother, Mr. J., and caseworker Heard were present remotely. The court first addressed Delgado's motion to withdraw as counsel for the mother. Delgado stated that she filed the motion based on the lack of communication with the mother, who indicated to her that she did not agree to Delgado's appointment as counsel. Delgado said they have had no discussions, so Delgado "was struggling with how [she could] represent [the mother] today with that in mind." Delgado said that her abilities were limited without the mother's cooperation.

¶ 18    The court recounted the history of the mother's representation, beginning in 2020 when the case first came into court, and stated that it was prudent for the mother to have an attorney assist in her defense of the termination petition. At the court's request, the State reported that the public defender represented the mother until March or April 2021, when Stewart was appointed. Stewart represented her until April 2022, when Schumm was appointed. Holcomb replaced Schumm in February 2024 and represented the mother until he withdrew and was replaced by Delgado in November 2024. The State further noted that the mother was present in court when it appointed

Delgado and admonished the mother that Delgado was the last attorney the court would appoint for the mother.

¶ 19    The court then addressed the mother directly, after she was placed under oath. Although the mother did not remember being present in court when Delgado was appointed, the court indicated that its notes, as well as the recitation by the State, reflected that she was present at that court date and was admonished that she was not entitled to an endless supply of attorneys. The mother then interrupted, saying "but that's illegal. You can't tell me how many attorneys I've got." The court began explaining the right to counsel under section 1-5(1) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-5(1) (West 2024)), but the mother interrupted again, so the court muted her microphone. The court attempted to explain to the mother the right to counsel under the Act and asked if she understood that the court is allowed to appoint an attorney for her if she is not able to provide her own private attorney. After being unmuted, the mother answered, "No, I don't understand. I'm a very illiterate person. [The] way you treated me the last four years, I'm illiterate. *** You treated me the worse. That white judge treated me good. He respected me, unlike you. You are very rude." The court stated that it respects every litigant who comes before the court and asked if the mother wanted to say anything further because the court was allowing Delgado to formally withdraw as appointed counsel but was appointing her as standby counsel and proceeding with the trial that afternoon. The mother did not object and responded by making a "thumbs up" gesture. The court then proceeded with the unfitness hearing.

¶ 20    The court began the unfitness hearing by taking judicial notice of the paternity, adjudication, and dispositional orders. The court further noted that the adjudicatory finding was neglect, injurious environment based on the mother's statements about her financial inability to

care for the children, and her mental health issues. The court also noted that at disposition, both parents were found unable to care for the children. The State then confirmed that it was proceeding as to both parents, pursuant to grounds (b) and (m) of section 1(D) of the Adoption Act (750 ILCS 50/1(D)(b), (m) (West 2024)), and that the nine-month periods pled for ground (m) were (1) August 4, 2022, through May 4, 2023, (2) May 4, 2023, through February 4, 2024, (3) December 4, 2023, through September 4, 2024, and (4) August 13, 2024, through May 13, 2025. The court admitted the State's exhibits, which included the March 2021 integrated assessment; 11 service plans covering the time periods of January 2021 to May 2025; 3 CASA reports covering December 2022 to August 2023; 9 agency court reports from 2022 to 2025; an order of protection from September/October 2020; the order of protection for the caseworker from 2022; an unusual incident report regarding the mother from May 2023; Mr. J.'s service records; and the mother's service records.

¶ 21    According to the March 2021 integrated assessment, domestic violence occurred between the mother and the children's father, Mr. J., and they were both aggressors. The mother denied any mental health diagnoses but reported she was previously diagnosed with schizophrenia and bipolar disorder. Prior records also showed that the mother was hostile and aggressive toward DCFS personnel. The mother blamed others for her difficulties, took no accountability for her own actions, and denied the neglect allegations.

¶ 22    Between the integrated assessment and the initial service plan from January 2021, recommended services included individual therapy, parent education/coaching, a domestic violence assessment, a substance abuse assessment, child/parent psychotherapy, and family therapy once the mother made sufficient progress in individual therapy. The service plan also

recommended that the mother participate in a psychiatric evaluation and a psychological evaluation. The service plan also recommended that the mother participate in anger management classes and work with a housing advocate to stabilize housing. At the time of the January 2021 service plan, the mother was permitted only supervised visits with the children. The March 2021 integrated assessment noted that the mother's visitation was suspended due to concerns about her behavior and recommended an assessment to determine whether visitation could safely resume.

¶ 23 Due to the breakdown in the mother's relationship with the prior agency, she was initially rated unsatisfactory in all recommended services, and the case was transferred to another agency in April 2021. In November 2021, she was again rated unsatisfactory for all recommended services, as there was no engagement from the mother for the entire reporting period. The mother reportedly refused to work with the assigned worker and refused to meet with the agency to discuss service referrals. The agency was also not able to make her housing advocate referral due to her refusal to cooperate with the agency.

¶ 24 The mother successfully completed parenting classes in January 2022, but did not engage in parent coaching, which remained outstanding in May 2022. Although she failed to comply with the initial referral, the mother began anger management and domestic violence services in May 2022 through the Latino Resources Institute (LRI). In May 2022, she still needed individual therapy as well as psychological and psychiatric evaluations because she failed to comply with prior referrals. The mother attended an intake assessment at St. Bernard Hospital in May 2022. The assessment recommended a partial hospitalization program and individual psychotherapy, but the mother rejected both services.

¶ 25    The children reportedly had little to no contact with the mother from May 2021 to November 2021. Between December 2021 and May 2022, the mother was consistent with weekly parent-child visits with Me., My., and Ma., but not with Mo. In March 2022, the agency reported that the mother's weekly supervised visits with the children were consistent for several weeks and going well. Between May 2022 and November 2022, the mother reportedly continued to engage in domestic violence services and anger management services at the LRI. However, according to the December 13, 2022, report from LRI, the mother was not in compliance with services because of excessive absenteeism, noting that her participation while in class was minimal and reflected indifference. On October 7, 2022, the agency referred the mother for a psychological evaluation to obtain additional information about her current level of cognitive, emotional, and behavioral functioning and development, and to better understand her mental health and identify additional supportive services.

¶ 26    The mother maintained consistent communication with the agency between February and March 2022 and was reportedly not engaging in the same inappropriate conduct reported by the previous agency. However, by August 2022, the mother was refusing to participate in any meetings with the current agency. The case was transferred from ChildLink to DCFS in December 2022, due to the mother's disruptive behaviors and safety concerns, which caused the prior case worker to file an emergency order of protection against the mother for ongoing harassment. At the case transfer in December 2022, ChildLink informed DCFS that throughout the case, the mother made minimal progress in services, was not compliant with the agency, and refused to provide pertinent information to agency and court staff. The mother was not participating in any services and refused to participate in the recommended mental health services. Upon receiving the assignment, DCFS

referred the mother for domestic violence classes, parenting classes, substance abuse assessment/recommendations, and individual therapy and family therapy after a psychiatric evaluation. The mother reportedly did not visit the children at all between October 2022 and December 2022, and she rarely answered the children's phone calls. According to a CASA report and the DCFS court report, visits resumed briefly, but the mother again stopped visiting the children in February 2023.

¶ 27    In May 2023, the mother was discharged from individual therapy with Mary and Tom Lea and Associates (MTLA) after one session because the clinician reported that the mother was not an appropriate candidate for individual therapy and recommended a higher level of care, a parenting capacity assessment, and a psychiatric evaluation. According to a report from MTLA, the mother attended her first therapy session with therapist Hannah Bueno on May 15, 2023, and made a threat against her caseworker's supervisor. Ms. Bueno and her supervisor filed a police report, and the mother's case worker informed MTLA that the mother's parent-child visitation would be suspended pending a psychiatric evaluation. The agency scheduled the mother for a psychiatric evaluation on August 9, 2023, but she cancelled that appointment and did not reschedule. The mother also failed to complete the psychological evaluation which was scheduled in mid-2023.

¶ 28    Caseworker Heard testified that she was the assigned DCFS caseworker since August 2023. At that time, the permanency goal for all four children was to return home. The mother had weekly virtual visits supervised by Heard due to concerns about the mother's behavior. The mother was still in need of domestic violence services, a substance abuse assessment, parent coaching, a psychological evaluation, a parenting capacity assessment, child-parent psychotherapy (CPP)

services, and family therapy. The mother was only participating in domestic violence services with WINGS. The mother prematurely withdrew from domestic violence services, and Heard re-referred her for domestic violence perpetrator services with Healthcare Alternative Services (HAS). After the mother initially failed to register for services with HAS, she eventually engaged in and completed domestic violence services with Avance in November 2024. Despite completing anger management with LRI, the mother was rated unsatisfactory in that service in November 2023 because she was not able to apply what she had learned to her everyday life. The mother completed substance abuse services through HAS in March 2024. Because the mother was discharged from individual therapy at MTLA after one session in 2023, Heard offered to refer her to another provider, but the mother declined the referral.

¶ 29    In Spring 2024, HAS referred the mother for mental health services, but she also rejected that referral. Heard testified that, prior to her assignment, the mother failed to attend a previously scheduled psychological evaluation and parenting capacity assessment. Heard made new referrals, and the mother completed a psychological assessment and parenting capacity assessment with Dr. Gladys Croom on March 28 and April 14, 2024. The mother was diagnosed with borderline personality disorder, other specified personality disorder with mixed paranoid and antisocial features, and unspecified bipolar and related disorder. The mother struggles with rationalizing maladaptive threatening behavior, truthfulness, and being accountable for her actions.

¶ 30    Due to her diagnoses, Dr. Croom recommended that the mother engage with a seasoned therapist, using some combination of cognitive behavior therapy and dialectic behavioral therapy, and consult with a psychiatrist to address anxiety and impulsivity. Dr. Croom recommended CPP, parent coaching, and supervised child visits. Dr. Croom also recommended that reunification

should be approached cautiously until all the recommendations were achieved and the mother was more forthcoming about her symptoms and behaviors. Heard testified that based on these evaluations, the agency recommended that the mother participate in cognitive behavior therapy/dialectic behavioral therapy, psychiatric services, and CPP. Heard spoke to the mother in May 2024 regarding the recommended services and informed her that she would need to complete them for successful completion of reunification services.

¶ 31    Between May and November 2024, the mother was rated unsatisfactory for failing to attend intensive individual therapy and failing to fully comply with the psychological and psychiatric evaluations. She was also rated unsatisfactory for failing to apply what she learned in anger management services. On September 5, 2024, the mother was participating in domestic violence services, which began in January 2024. The November 2024 service plan reflects that she continued to participate in the domestic violence services.

¶ 32    Heard testified that she had explained to the mother that her current therapy provider was insufficient and needed a different skill set to comply with the recommendation for cognitive behavior therapy and dialectic behavior therapy. Heard also explained to the mother the potential consequences of refusing the referral, including that the agency would make a finding that she did not successfully complete her services and DCFS would recommend a goal change. Nonetheless, the mother declined Heard's referral for therapy with Serene Health. The mother has never completed the recommended therapy services, which remain outstanding for reunification.

¶ 33    Heard spoke to the mother about getting an updated psychiatric evaluation and explained to her that it was necessary because of the recent recommendation, but the mother refused to engage in that service. The mother has never completed the updated psychiatric evaluation, and

that service likewise remains outstanding. Heard was never able to refer the mother to either the recommended CPP or family therapy because she never made adequate progress in therapy to allow the agency to make those referrals.

¶ 34    Heard testified that there was a history of aggression and hostility reported by former and current foster parents and the previous agency. Additionally, in May 2023, the mother reportedly made threats during a therapy session with MTLA. Heard's September 5, 2024, court report reflects that the agency suspended visitation in May 2023 and resumed visitation in July 2023, restricted to virtual visits only.

¶ 35    Heard testified that when she was first assigned in August 2023, the mother was not participating in the recommended parent coaching, so Heard re-referred her to Family Advocacy Center. The mother began parent coaching in March 2024 and was permitted three supervised visits for the limited purpose of participating in parent coaching. However, the mother was unsuccessfully discharged from parent coaching in May 2024 because she stopped participating in parent-child visits and would not respond to the provider. The mother never reengaged in parent coaching, and it remains an outstanding reunification service. After May 2024, the mother had minimal contact with the agency and did not make herself available for virtual visitation with the children. Accordingly, the agency never restarted in-person visits with the mother and the children. Heard has never recommended unsupervised visits for the mother due to concerns about her behavior.

¶ 36    Heard testified that she has not had any verbal communication with the mother since May 2024, despite attempting over 20 times to contact her by e-mail and telephone. Whenever the mother responded, she refused to answer Heard's questions. Instead, the mother would raise her

own issues, none of which addressed moving the case forward. The mother has not asked for in-person visits with the children since she last visited in May 2024. Heard testified that she had set up scheduled alerts to be sent to all participants as reminders of virtual visits, from May 2024 through January 2025. Because these reminders were automated, there was no way to verify whether the mother had received them. However, Heard also had e-mailed the mother directly to let her know that the links to virtual visits were still available, should she choose to resume contact with the children. The mother would occasionally respond to e-mails but never addressed the issue of visits.

¶ 37    During Heard's testimony, the court became concerned after observing the mother holding a second device, which appeared to be a cellphone, and aiming it at the screen of the Zoom proceeding. The court admonished the mother that she was not permitted to record the proceedings and that doing so was a felony offense. The mother denied recording on her cellphone and insisted that she was sending an e-mail. Shortly after Heard's testimony resumed, the court noted that the mother had turned off her camera. The court interrupted the testimony of Heard three more times to admonish the mother to put her cellphone away during the proceedings. Each time, the mother challenged the court's directives and argued that she needed to use her cellphone or have it accessible to send messages. The mother also interrupted Delgado's cross-examination of Heard by accusing the court of misconduct and left the Zoom courtroom for approximately six minutes while Heard was being cross-examined by Mr. J.'s counsel.

¶ 38    At the conclusion of Heard's testimony, the ASA and APG rested. Delgado then informed the court that she intended to call the mother as her first witness. Because of time constraints, the court continued the hearing to the next court date, noting that it did not want to "limit in any way

[the mother's] opportunity to speak to this Court." The mother, upon hearing that the next court date was scheduled to be in-person, stated that she was unable to attend court in-person due to being "very sickly." The court instructed her to get a note from a physician that she was too ill to attend court in-person, to which the mother responded, "I understand. Smart enough a**. She's just a smart mouth, very rude."

¶ 39    The unfitness hearing continued on August 12, 2025. Delgado appeared via Zoom as standby counsel for the mother, who was also present remotely. Delgado called the mother to testify and questioned her regarding the status of her reunification services during the first time period pled by the State in the motion for TPR, August 4, 2022, to May 4, 2023. The mother stated that she was advised to complete a psychological evaluation, anger management training, parenting classes, and domestic violence classes. She reported attending six weeks of substance abuse services. She testified that she had two psychological evaluations done at St. Bernard Hospital, the first of which was in September 2022. During the relevant time period, the mother visited the children "sometimes" and blamed the agency for not giving her all her supervised visits.

¶ 40    Delgado then questioned the mother about services and visitation during the second time period pled, from May 4, 2023, to February 4, 2024. The mother testified that during that time, she participated in parent coaching and a third psychological evaluation by Dr. Croom. The mother reported participating in domestic violence services with Avance. She stated that she did not have any in-person visitation with the children after May 2023 but did subsequently have approximately five phone calls with them during parent coaching sessions.

¶ 41    Delgado then questioned the mother about services and visitation during the next time period pled, from December 4, 2023, to September 4, 2024. The mother said that she did not

participate in any services during this time period and acknowledged that she was supposed to do psychotherapy. The mother reported participating in domestic violence counseling with Wings but admitted that she had never participated in psychotherapy at any agency. She denied receiving a referral from Heard for psychotherapy or "cognitive dialectic behavioral therapy" and admitted that she "just sat back" and did not follow up with the agency. The mother confirmed receiving a copy of Dr. Croom's written evaluation reports but denied knowing their findings or recommendations because the mother only "scan[ned] through it."

¶ 42    Delgado then questioned the mother about services and visitation during the final time period pled, from August 13, 2024, until May 14, 2025. The mother testified that during that time, she only had e-mail communication with Heard and did not receive any additional service referrals. The mother also testified that during the last time period, her ability to work with her caseworker was inhibited because the mother had been sexually harassed at work. She stated that she had reported the offender to the police and obtained an order of protection. She also filed complaints with federal agencies, and the Federal Bureau of Investigation had opened an investigation. She did not, however, report this issue to Heard.

¶ 43    The mother stated that, throughout the case, she had participated in three psychological evaluations and one psychiatric evaluation. Upon cross-examination by the State, the mother testified that the first time she went to St. Bernard Hospital, the doctor did a psychiatric and psychological evaluation at her request. The mother later returned to St. Bernard, and the doctor conducted a psychological evaluation only, based on her request. Although the doctor recommended that she participate in a psychiatric partial hospitalization program, the mother did not believe she really needed it because the doctor told her that he offers that program for "every

patient that comes through his door." Delgado objected when the mother was asked why the case came into court, arguing that it was beyond the scope of the direct examination, but the court overruled the objection. The mother testified that the case was screened in because DCFS had concerns about domestic violence and homelessness, but she denied a history of domestic violence.

¶ 44    Then, Mr. J. testified about his relationship with the mother and the birth of their four children. Mr. J. stated that the mother was verbally abusive toward him throughout their relationship, but she became physically abusive in 2019. He described a particular incident that occurred while visiting the children in January 2020, when he was seriously injured after jumping from a second story window to escape the mother, who was chasing him around the house with a knife. During Mr. J.'s testimony, Delgado objected to leading questions about an order of protection entered against Mr. J. in September 2020. She also cross-examined Mr. J. about the order. He testified that within one month after the mother had filed an order of protection against him in September 2020, he sought an order of protection for himself against her. He denied that they had reconciled from May through August of 2020.

¶ 45    Mr. J.'s mother, Ms. D., testified about Mr. J.'s place of residence. During Ms. D.'s testimony, the mother was observed holding up pictures of Mr. J., Ms. D., and the children and was admonished by the court to not disrupt the proceedings. The mother said she was doing it because they were cute and asked the judge if she thought they were cute too. The court then muted the mother's device.

¶ 46    During closing argument, the ASA and APG asked for unfitness findings under grounds (b) and (m). The APG also argued that these children came into care in 2020 and, since that time, the mother had been referred multiple times for services. To date, several of these services

remained outstanding. Regarding visits, the APG argued that during the tenure of this case, the mother had her visits suspended due to her behavior, was inconsistent with virtual visits, and had not visited the children since May of 2024.

¶ 47    Delgado, on behalf of the mother, argued that the State has a heavy burden to prove by clear and convincing evidence that the mother was unfit. Delgado argued that the mother made a good faith effort to comply with reunification services, despite challenges in completing some of them. Delgado also argued that the mother made efforts to visit with the children during the first three time periods set forth by the State. Delgado asked the court to find that the State had not proven the mother unfit by clear and convincing evidence and deny the TPR petitions.

¶ 48    After arguments concluded, the court issued its ruling, first finding that Heard had testified credibly and the mother and Mr. J. had testified credibly as to "their reality." The court noted the findings made at adjudication and disposition. The court then found that the State met its burden by providing clear and convincing evidence that the mother was unfit based on both grounds— (m) failure to make reasonable efforts or progress based on the time frames pled in the State's supplemental pleading and (b) failure to maintain a reasonable degree of interest, concern, or responsibility for the children. The court noted that the finding of unfitness was proven for each of the time periods pled and supported by the totality of the evidence and the credible testimony, despite the mother doing some of the services. The court noted that according to *In re Grant M.*, 307 Ill. App. 3d 865 (1999), the fact that a parent, who has failed to demonstrate a reasonable degree of interest for an extended time, begins to show interest after a termination action is commenced does not preclude a finding of unfitness based upon the parent's earlier behavior. Although the court acknowledged that the mother may have engaged in or tried to engage in some

services, the court found that her efforts were "a bit too late based upon all of the evidence that I received."

¶ 49    The court then commenced the best interest hearing on August 12, 2025.

¶ 50    C.M., a foster parent and maternal aunt, testified that she was the foster parent for Me. (age 10), My. (age 9), and Ma. (age 7), who had been in her home for the past three years. C.M. lives alone with the children in a three-bedroom home, where the two youngest children, My. and Ma., share a room. C.M. has a great relationship with the children, and they like to crack jokes with each other, read, dance, cook, and go out to eat as a family. C.M. also has a son, who has a loving relationship with the children. C.M. said all three children were doing well in school and did not need any special services. It meant a lot to C.M. that they are doing well and are often on the school's honor roll because that meant they are on the right path and in the right environment. Their fourth sibling, Mo., is placed with C.M.'s sister, and the children see each other about four to five times per month, which would continue in the event of adoption.

¶ 51    C.M. stated that she wished to adopt her niece, My., and her nephews, Me. and Ma., because she loved them as if they were her own. C.M. believed adoption is the best thing for them and that she will ensure they are safe and well cared for. C.M. described that when the children were first placed in her home, they were "a lot," but she did everything she could for them. She believes they have come a long way because of the love and care she has given them. C.M. also testified that she spoke with the children in her care about adoption and they all expressed that they wanted C.M. to adopt them. C.M. did not have any relationship with the mother, who is her sister, because she was very rude, disrespectful, and controlling. C.M. also expressed being afraid for her

life because of the mother. Delgado elicited testimony regarding C.M.'s past marijuana use, arguing that it was relevant to her ability to safely care for the children.

¶ 52    G.M., a foster parent and maternal aunt, testified that 14-year-old Mo. has lived with her and her three children for approximately two years. Mo. attends school regularly and gets straight A grades. Mo.'s younger siblings are placed with G.M.'s sister, C.M., and the children visit each other about three or four times per month. G.M. understands the importance of their sibling bond and is committed to continuing that contact. She stated that she was not open to having the mother visit with Mo., due to prior incidents that jeopardized the safety of G.M.'s family. G.M. was open to continuing Mo.'s visitation with Mr. J. as long as it was safe, appropriate, and did not upset Mo.

¶ 53    In the middle of her testimony, G.M. suddenly stated that she could not continue, prompting an off the record conference. When the case resumed, G.M. testified that she only just realized that the mother was present on Zoom and that she was uncomfortable testifying in her presence. G.M. reported that the mother had previously recorded her on Zoom court and that it got back to her and caused problems. After some reassurance by the court, G.M. agreed to continue testifying. The court issued a fourth admonishment to the mother to not record any part of the proceedings and noted that she would be held in contempt if she did not comply.

¶ 54    G.M. testified she wants to adopt Mo., who is just like one of G.M.'s biological children. She and Mo. have worked hard to gain each other's trust, and Mo. is thriving in her home. G.M. ensures that she and Mo. have frequent quality one-on-one bonding time, and she attends all of Mo.'s events. G.M. has explained to Mo. the difference between adoption and guardianship, and Mo. stated that she was amenable to adoption. Mo. expressed a desire to continue visiting only with her father, Mr. J., after adoption. G.M. testified that she does not use illegal substances or

marijuana and there have not been any allegations of domestic violence between her and her sister C.M.

¶ 55    Before case worker Heard testified, the court twice admonished the mother to remain on camera and informed her that she would be placed in the waiting room if she did not comply with the court's instructions. Heard then began her testimony, stating she has no concerns about Mo. in G.M.'s home, and described Mo.'s bond with G.M. and her children as very loving. Mo. has repeatedly told Heard that she wished to be adopted by G.M., most recently in July 2025.

¶ 56    Heard testified that she does not have any concerns about Me., My., and Ma. in their current home with C.M. Heard has observed a wonderful, loving bond between the children and C.M. All three children have privately expressed to Heard multiple times that they wished to be adopted by C.M. Heard stated that it was the agency's position that TPR was in the children's best interest because it would give them the opportunity to achieve permanency in stable, loving homes. Heard added that the foster parents preferred adoption over guardianship. Heard testified that 10-year-old Me. and 14-year-old Mo. have expressed that they do not want a relationship with the mother, while 9-year-old My. and 7-year-old Ma. wish to have some contact with her, either on the phone or in person. Heard then clarified that although the children expressed willingness to visit the mother should the opportunity present itself, they no longer ask to see her. Heard did not ask the children additional questions regarding visits because the mother had not interacted with them in over a year prior to the hearing.

¶ 57    Heard last observed interaction between the mother and the children in 2024, where Heard noticed some affection between the mother and the younger two children, Ma. and My. Since May 2024, Heard provided the mother with updates regarding the children but has not spoken with the

mother since May 2024, despite sending numerous texts and e-mails. Heard also sent regular e-mail reminders to the mother regarding visitation, which likewise went unacknowledged.

¶ 58    According to the DCFS court report dated May 22, 2024, Mo., Me., and My. all expressed not wanting to return home to the mother. Six-year-old Ma. was not able to say whether he wanted to return home to the mother. Mo. had "mixed feelings" about visiting with the mother, and Me. reported that he preferred virtual visits over in-person visits with the mother. Eight-year-old My. and six-year-old Ma. expressed that they preferred in-person visits with the mother. Prior to argument, the court took judicial notice of the evidence presented at the unfitness hearing.

¶ 59    At closing arguments, the ASA and APG argued that it was in each child's best interest to terminate parental rights. The APG also noted that all of the children are flourishing in their current homes and each has expressed a desire to be adopted. On behalf of the mother, Delgado argued there are less restrictive options that should be considered by the court, including guardianship, which would preserve the parent-child relationship. Because two of the children expressed that they are open to a relationship with the mother, Delgado argued that the court needs to consider whether severing the legal relationship would cause them emotional harm.

¶ 60    The court, noting that it considered each of the factors set forth in the Act and relevant case law, found that it was in the children's best interest to terminate parental rights and appoint DCFS guardian with the right to consent to adoption. The court then changed the permanency goal for each of the children to adoption.

¶ 61    The mother appealed, asking the court to reverse "all orders leading to the TPR" judgment on August 12, 2025.

¶ 62                                    II. ANALYSIS

¶ 63                          A. Right to Counsel and Due Process

¶ 64    The mother argues that she did not waive her statutory right to counsel and the trial court violated her rights to counsel and procedural due process when the court granted Delgado's motion to withdraw and compelled the mother to proceed *pro se* with the assistance of only appointed standby counsel. The mother argues that the court improperly allowed Delgado to withdraw without giving the mother advance notice of the consequences of the mother's noncooperation with appointed counsel. Specifically, the mother argues that when the court previously ruled that Delgado, who was the mother's fifth counsel, was the final attorney the court would appoint in this matter, the court failed to explain what it meant to proceed *pro se* with only standby counsel and failed to warn the mother that she would have to proceed *pro se* and without an opportunity to prepare to meaningfully represent herself.

¶ 65    We review *de novo* the legal question of whether the mother was deprived of her right to counsel. See *People v. Lesley*, 2018 IL 122100, ¶ 30 (discussing the statutory right to counsel under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2012))). Although there is no constitutional right to counsel in proceedings under the Act, a parent has a right to be represented by counsel, who shall appear at all stages of the trial court proceeding, including any termination of parental rights proceedings, subject to a withdrawal or vacatur of appointment pursuant to Illinois Supreme Court Rule 13 (eff. Jan. 1, 2023). 705 ILCS 405/1-5(1) (West 2024). Further, (with one exception not relevant to this case), "[a]t the request of any party financially unable to employ counsel, *** the court shall appoint the Public Defender or such other counsel as the case may require." *Id.* Rule 13 requires counsel to give the client reasonable notice of the

written motion to withdraw and advise the client to retain other counsel or file an appearance within 21 days of the order permitting a withdrawal. Ill. S. Ct. R. 13(c)(2) (eff. Jan. 1, 2023).

¶ 66    Where a party received notice and was present at the hearing on the motion to withdraw, Rule 13 has been interpreted to require a continuance of at least 21 days after the entry of the order granting withdrawal, so that the party can retain other counsel or enter her own supplementary appearance. *In re Marriage of Miller*, 273 Ill. App. 3d 64, 69 (1995); *In re Marriage of Santa Cruz*, 179 Ill. App. 3d 611, 621-22 (1989). During this 21-day transition period, the circuit court should not render any rulings prejudicing the party's rights. *Miller*, 273 Ill. App. 3d at 69. The failure to grant a 21-day continuance may constitute reversible error. *Santa Cruz*, 179 Ill. App. 3d at 622. The court may deny a motion to withdraw "if granting the motion would delay the trial of the case, or would otherwise be inequitable." Ill. S. Ct. R. 13(c)(3) (eff. Jan. 1, 2023). A trial court's decision to allow or deny a motion to withdraw is reviewed for an abuse of discretion (*In re J.D.*, 332 Ill. App. 3d 395, 404 (2002)), which occurs when the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it (*Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 23).

¶ 67    Here, Delgado filed the motion to withdraw only two days before the unfitness hearing began. Also, the motion lacked any indication that the mother was given reasonable notice and was advised of her right to obtain substitute counsel within 21 days. Moreover, because the trial court commenced the unfitness hearing on the same day the court granted the motion to withdraw, the court did not give the mother 21 days to obtain substitute counsel. The State concedes that the trial court erred in granting the motion to withdraw.

¶ 68 We conclude that the trial court abused its discretion by granting Delgado's motion to withdraw because it did not comply with Rule 13. Moreover, the record supports the mother's assertion that she did not relinquish her right to counsel by waiver, forfeiture, or waiver by conduct. See *Lesley*, 2018 IL 122100, ¶ 36.

¶ 69 The State argues, however, that reversal of the trial court's unfitness and best interest findings is not required because the court protected the mother's due process rights when the court, in its discretion, immediately ordered Delgado to act as standby counsel. The State also argues that Delgado performed in a manner substantially similar to an attorney representing a client, and therefore, the mother suffered no prejudice.

¶ 70 The role of standby counsel derives from criminal proceedings where the defendants seek to waive representation based on the sixth amendment of the U.S. constitution (U.S. Const., amend. VI) and the state constitution. *People v. Gibson*, 136 Ill. 2d 362, 374-75 (1990). The Illinois Supreme Court found that no state statute or rule of court forbade the appointment of standby counsel to assist a *pro se* defendant and that a trial judge has discretion to appoint standby counsel, notwithstanding the defendant's decision to represent himself. *Id.* at 375. The court determined standby counsel may "act as attorney *** before [the] court for the defendant." (Internal quotation marks omitted.) *Id.* at 376-77. Normally, the role of standby counsel is to advise the *pro se* defendant about legal procedures to the extent the *pro se* defendant wishes such advice and to answer any legal questions the *pro se* defendant may have. *People v. Hughes*, 2025 IL App (4th) 240514, ¶ 149. But the Illinois Supreme Court in *Gibson*, following *McKaskle v. Wiggins*, 465 U.S. 168, 173 (1984), rejected the view that the role of standby counsel is "to be seen but not heard." (Internal quotation marks omitted.) *Gibson*, 136 Ill. 2d at 377. Moreover, *McKaskle* found

it acceptable for standby counsel to make motions and objections, question witnesses, introduce evidence, and make a closing argument, in addition to helping ensure the defendant's compliance with basic rules of courtroom protocol and procedure. *McKaskle*, 465 U.S. at 176-88; see *Gibson*, 136 Ill. 2d at 378. Even standby counsel's unsolicited involvement was within reasonable limits. *McKaskle*, 465 U.S. at 188.

¶ 71    Parents have a constitutional right to the custody of their children, and the deprivation of that right must comply with the requirements of procedural due process. *In re Andrea F.*, 208 Ill. 2d 148, 165 (2003); *In re Ch. W.*, 408 Ill. App. 3d 541, 550 (2011). The due process clause of the United States Constitution provides heightened protection against governmental interference with the fundamental rights of parents to make decisions concerning the care, custody, and control of their children without unwarranted state intrusion. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 23. Due process in the context of interference with parental rights is achieved by compliance with the provisions of the Act and fundamental fairness. *Id.* Claims of due process violations are questions of law that we review *de novo*. *In re A.M.*, 402 Ill. App. 3d 720, 723 (2010); *In re D.W.*, 214 Ill. 2d 289, 309 (2005).

¶ 72    Illinois courts analyze the possible deprivation of a parent's due process rights by balancing the factors enunciated in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *In re Travarius O.*, 343 Ill. App. 3d 844, 851 (2003); *In re R.H.*, 2024 IL App (4th) 241048, ¶ 36. Specifically, the court must consider (1) the private interest implicated by the official action, (2) the risk of an erroneous deprivation of that interest through the proceedings used and the probable value, if any, of additional or substitute safeguards, and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute safeguards

would entail. *In re R.H.*, 2024 IL App (4th), 241048, ¶ 36. Furthermore, this court does not find a due process violation if the party alleging the violation fails to establish substantial prejudice. *Snow v. Chicago Transit Authority*, 2022 IL App (1st) 201217, ¶ 54; *In re J.V.*, 2018 IL App (1st) 171766, ¶ 191; *Stratton v. Wenona Community Unit District No. 1*, 133 Ill. 2d 413, 435 (1990).

¶ 73 In applying the first *Mathews* factor, two private interests are implicated: the mother's fundamental right to the care and custody of her children, and the children's interest in a permanent, stable home. *In re Travarius O.*, 343 Ill. App. 3d at 851. Courts will not extinguish this fundamental interest of the parent lightly, but the children's interest in a stable and safe home environment and in maintaining a relationship with their foster parents is also important. See *id.* The Illinois Supreme Court has stated that "the specter of delay is especially troublesome" where the case concerns the future of young children. *J.S.A. v. M.H.*, 224 Ill. 2d 182, 196 (2007). These proceedings were delayed previously by the mother's prior counsel withdrawing, due to lack of payment. Not only is the stated purpose of the Act to expeditiously achieve permanency, but courts also have found that delays in termination proceedings in particular impose a grave cost to the lives of the children involved. *In re S.W.*, 2015 IL App (3d) 140981, ¶ 37; see *In re S.L.*, 2014 IL 115424, ¶ 23 (it is not in the children's best interest for their status to remain in limbo for extended periods of time). Considering the children have been in DCFS care for over five years since November 2020, the need for the unfitness and best interest hearings to have proceeded expeditiously in June and August of 2025 weighs against the mother's interest.

¶ 74 Under the second *Mathews* factor, we must consider the risk of an erroneous deprivation of the mother's and the children's interests where the fifth and final attorney withdrew and the mother was denied additional appointed counsel at the unfitness and best interest hearings, which

commenced without any continuance. We must also consider whether the appointment of Delgado as standby counsel for the mother at the unfitness and best interest hearings mitigated any risk of an erroneous deprivation of her parental interest. Neither the Act nor judicial precedents specify how many times a trial court must appoint counsel in the event that counsel withdraws or an indigent parent no longer desires their particular services. *In re Travarius O.*, 343 Ill. App. 3d at 851. The trial court here, through its repeated appointments of counsel, made reasonable efforts to protect the mother's right to counsel. See *id.*

¶ 75    In *Travarius O.*, this court upheld the trial court's denial of a fourth attorney for the parent, finding there was no value in appointing another attorney as an additional safeguard when the parent failed to cooperate with the prior three attorneys. *Id.* at 852. Specifically, the parent no longer wanted the first attorney, who then withdrew. *Id.* at 851. The second attorney withdrew because he did not believe he could proceed without violating ethical rules, and the parent refused to proceed with the third attorney. *Id.* Given the parent's failure to cooperate with three separate attorneys, the reviewing court saw no value in again appointing the parent new counsel. *Id.* at 852. The reviewing court noted that the parent failed to argue how his apparent lack of effective representation prejudiced him and held that the trial court did not abuse its discretion by failing to appoint a new attorney for the parent after the third and final attorney withdrew. *Id.* at 852.

¶ 76    The record here shows that the mother failed to cooperate with several of her prior appointed attorneys; therefore, appointing a sixth attorney would have been of no value. Also, the mother did not request a continuance to obtain private counsel. No evidence showed that the mother would have been able to retain private counsel if a continuance was granted, and the record is clear that the mother wanted appointed counsel. The trial court provided an alternative,

additional safeguard that minimized any risk of an erroneous deprivation of the mother's parental interest by immediately appointing Delgado as standby counsel. Delgado had been the mother's appointed counsel since November 2024. Delgado was knowledgeable about the case; had appeared in court several times on the mother's behalf before trial, including the case management conference in May 2025; and had received discovery for trial. Although the mother claims the record does not show that she received discovery, nothing in the record indicates any deficiency in discovery.

¶ 77    Moreover, Delgado's actions as standby counsel protected the mother's fundamental interest as a parent and supported the fundamental fairness of the hearings. The record shows that Delgado—despite her designation as standby counsel and the mother's failure to communicate or cooperate with her—provided satisfactory and appropriate representation throughout the termination proceedings by performing the duties of appointed counsel, including participating in the case management conference, making appropriate objections during the witnesses' testimony, cross-examining witnesses, presenting and questioning the mother as a witness with a great deal of latitude from the court, and making closing arguments for the mother at the unfitness and best interest hearings.

¶ 78    Furthermore, the mother had another opportunity to cooperate with Delgado before the presentation of the mother's case because more than one month elapsed between the first and second sessions of the unfitness hearing. Although the mother claims the court did not allow her to speak, the record shows that the court's actions were to curb the mother's disruptive behaviors during the hearing. In addition, the mother offers no argument beyond speculation as to how Delgado's services denied the mother effective representation and thus prejudiced her, as is

required under *Strickland v. Washington*, 466 U.S. 668 (1984). See *In re Travarius O.*, 343 Ill. App. 3d at 852. We find that the second *Mathews* factor weighs against the mother.

¶ 79 Under the third *Mathews* factor, we must consider the State's interest in carrying out the mandates of the Act, including preserving and promoting the welfare of the children, achieving permanency for the children at the earliest possibility, and reducing the cost and burden of termination proceedings. *Id.* The State's interest in preserving and promoting the child's welfare would not be served where termination proceedings are delayed. *In re N.T.*, 2015 IL App (1st) 142391, ¶ 51. Such delay would defeat the child's fundamental right to a stable, nurturing home, and cause grave harm to the children. *Id.* ¶¶ 52-53. This court also has considered the State's interest in reducing the cost and burden of termination proceedings and noted that each time another attorney was appointed, it prolonged the proceedings, sometimes by several months. *Id.* ¶ 53; *In re Travarius O.*, 343 Ill. App. 3d at 852. We find that this *Mathews* factor weighs against the mother.

¶ 80 After considering the three *Mathews* factors, we conclude that the mother was not denied due process when the trial court, without delaying the start of the unfitness hearing, (1) erroneously allowed Delgado to withdraw without first complying with Rule 13, (2) properly denied the mother's request for a sixth appointed counsel, and (3) properly exercised its discretion to appoint Delgado to act as the mother's standby counsel. The record shows that the court balanced the mother's interest with the children's interest, considering the five years the children have been in DCFS's care, the mother's track record of noncooperation with her attorneys, and the court's acknowledgment that it was prudent for the mother to have an attorney assist her in the TPR hearing. The court's decision to appoint Delgado as the mother's standby counsel balanced these

multiple interests, upheld the fairness of the proceedings, and protected the mother from proceeding in a manner detrimental to her interests because Delgado presented the mother's evidence and defended her position throughout the proceedings. Consequently, the risk that the mother was erroneously deprived of her fundamental right to the care, custody, and control of her four minor children was minimal. Furthermore, given the lengthy history of the mother's past actions concerning her representation, the court could reasonably conclude that granting a continuance to appoint a sixth attorney would have caused unreasonable delay and not yielded different results.

¶ 81                               B. Termination of Parental Rights

¶ 82    The mother argues that her parental rights should not have been terminated because of the bond between her and her children. She contends that even if she had shortcomings, there was no evidence that her continued relationship with the children was inconsistent with their best interest, stability, and permanence.

¶ 83    Once a trial court finds a parent unfit, the court must then consider whether it is in the children's best interest to terminate parental rights. *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 88. The issue that singly must be decided is the best interest of the children. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 18. After a finding of unfitness under the Adoption Act, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004); see *In re M.R.*, 2020 IL App (1st) 191716, ¶ 28 (affirming best interest to terminate the mother's parental rights where a foster parent provided the child with security, love and stability). The State must prove by a preponderance of

the evidence that termination is in the children's best interest. *In re M.R.*, 2020 IL App (1st) 191716, ¶ 27.

¶ 84    The trial court's decision concerning the termination of parental rights is afforded great deference by the reviewing court (*In re J.B.*, 2019 IL App (4th) 190537, ¶ 33) and will not be reversed unless it is against the manifest weight of the evidence (*In re M.W.*, 2019 IL App (1st) 191002, ¶ 61). The trial court's best interest decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 20. There is a strong and compelling presumption in favor of the result reached by the trial court in child custody cases. *Id.*

¶ 85    Section 1-3(4.05) of the Act lists 10 best interest factors with subfactors that the trial court should consider in the context of the children's age and developmental needs when determining the children's best interest. 705 ILCS 405/1-3(4.05)(a)-(j) (West 2024). These factors include the children's need for permanency and stability, where they feel love and attachment, the bond with caregiver and family, and connection with family. *Id.* The Act was amended in February 2025 to include "the child's wishes and long-term goals, including the child's wishes regarding available permanency options and the child's wishes regarding maintaining connections with parents, siblings, and other relatives." Pub. Act 103-1061, § 15 (eff. Feb. 5, 2025) (amending 705 ILCS 405/1-3(4.05)(e)).

¶ 86    Additionally, the trial court may consider the nature and length of the child's relationship with a present caretaker and the effect a change in placement would have upon the child's emotional and psychological well-being. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. The trial court's best interest ruling does not need to contain an explicit reference to each of the factors,

and a reviewing court does not need to rely on any basis used by the trial court in affirming its decision. *Id.* No single best interest factor is dispositive. *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48.

¶ 87    Here, the four children are in stable pre-adoptive homes with their maternal aunts. Me., My., and Ma. are with C.M., and Mo. is with G.M. The children have been well cared for by their respective caregivers for over two years, and the agency has no concern with these caregivers' ability to meet the children's needs. The four children share a loving, close bond with their respective caregivers and have expressed a desire to be adopted. C.M. and G.M. have expressed that they wish to adopt the children and are committed to supporting the children's bond with each other. While the two younger children, My. and Ma., expressed a willingness to have a continued relationship with the mother if it were offered, DCFS caseworker Heard testified that they do not ask to visit their mother. The agency supports termination of parental rights and believes it is in the children's best interest, particularly because it is their best option for providing stability in a loving home.

¶ 88    On appeal, the mother makes the unsubstantiated claim that "it is not apparent that the court gave full consideration to the children's background and familial ties, and sense of attachments and continued affection," which is one of the best interest factors enumerated in the Act. To the contrary, there was uncontroverted testimony that the children are all placed with relatives, with whom they feel deep attachment. Three of the children are placed together. Both aunts, who are sisters, are committed to maintaining the siblings' bond with each other. The mother also argues, without any factual support, that "it is not clear that [the trial court] gave sufficient consideration to the mother-child bond." To the contrary, the court acknowledged the love that the mother had

for her children. However, there was uncontroverted testimony that all four children wished to be adopted. Although My. and Ma. expressed a continued willingness to visit the mother, none of the children wanted to return home to her.

¶ 89    The mother argues that the court must consider the possibility of maintaining a relationship between her and the children based on testimony that in May 2024, more than a year prior to the best interest hearing, the children were observed displaying affection for the mother and appeared to bond with her. The evidence, however, shows that the mother made no effort to visit the children since she quit parent coaching in May 2024. Moreover, this court defers to the trial court's balancing of the best interest factors, which include family bonds, and the weight to be given to the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). Under a manifest weight of the evidence standard, we owe deference to the trial court and will not substitute our judgment for that of the trial court. Although the mother challenges the trial court's finding that she had not shown adequate interest and/or made adequate efforts at reunification until after the TPR petitions were filed, any evidence regarding the mother's efforts must be viewed in the context of the statutory best interest factors.

¶ 90    The trial court properly determined that it was in the children's best interest to terminate the mother's parental rights and that the manifest weight of the evidence supports the court's findings. Accordingly, we affirm the trial court's best interest findings and termination orders.

¶ 91                                         III. CONCLUSION

¶ 92    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 93    Affirmed.

---

***In re Mo. J.*, 2026 IL App (1st) 251573**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 20-JA-1535 through 20-JA-1538; the Hon. Lisa M. Taylor, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Suzanne Isaacson, of Oak Park, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Gina DiVito, and Adam C. Motz, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, Carrie Fung, and Maria A. Petrone, of counsel), for other appellees. |

---