2026 IL App (1st) 251072-U

FOURTH DIVISION
Order filed: June 18, 2026

No. 1-25-1072

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| *In re* E.V., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 2022 JA 899 |
| v. | ) | |
| | ) | |
| Elizabeth V., | ) | Honorable |
| | ) | Debjani Desai, |
| Respondent-Appellant.) | ) | Judge, presiding. |

_____

JUSTICE QUISH delivered the judgment of the court.
Presiding Justice Navarro and Justice Ocasio concurred in the judgment.

## ORDER

¶ 1     *Held*:  The circuit court's orders finding that respondent was an unfit parent and that it was in the best interest of the minor child to terminate respondent's parental rights were not against the manifest weight of the evidence and are affirmed.

¶ 2     Respondent Elizabeth V. ("Elizabeth") appeals from the orders of the circuit court of Cook County terminating her parental rights to her daughter E.V. (born in November 2020). On appeal, Elizabeth argues that the circuit court's orders finding that she was unfit as a parent and that it was

in E.V.'s best interest to terminate her parental rights were against the manifest weight of the evidence. For the following reasons, we affirm.[1]

¶ 3    I.    BACKGROUND

¶ 4    In December 2022, the State filed a petition for adjudication of wardship alleging that E.V. was neglected, abused, and in an environment injurious to her welfare. The petition alleged that Elizabeth was found unresponsive in a motel room while E.V. was present on December 5, 2022. Elizabeth was transferred to the hospital where, according to medical personnel, she "was uncooperative and tested positive for cocaine." Elizabeth stated that she had taken an unknown pill she bought "off the street" that she thought was Xanax. Medical personnel observed unexplained facial bruises on E.V., but they were unable to obtain consent to treat her because Elizabeth was under the influence of illegal substances. The petition observed that Elizabeth was "undomiciled" and the "[p]utative father's identity and whereabouts [were] unknown."[2] The petition alleged that Elizabeth had one prior indicated report for substantial risk of physical injury/environment injurious to health and welfare by neglect and had two minors not in her care. The State also filed a motion for temporary custody, asserting that there was an immediate and urgent necessity to take E.V. into temporary custody under 705 ILCS 405/2-10 (West 2024).

¶ 5    The circuit court entered a temporary custody order finding probable cause that E.V. was abused or neglected and there was an immediate and urgent necessity to remove E.V. from

---

[1] This matter qualifies for an accelerated disposition under Supreme Court Rule 311(a) (eff. Jul. 1, 2018). Based on the date the notice of appeal was filed, a decision in this case was originally due on November 3, 2025. However, because the record was filed approximately two months after the deadline, the parties filed a supplemental record and the parties sought and received multiple extensions of time in which to file their briefs, we find good cause to extend the deadline. See Ill. Sup. Ct. R. 311(a)(5).

[2] E.V.'s father was not identified during the proceedings in the circuit court. E.V.'s father was defaulted for want of appearance after he was notified by publication, his parental rights were terminated, and he is not participating in this appeal.

Elizabeth's care based on the allegations in the petition. The court granted temporary custody of E.V. to the Department of Children and Family Services ("DCFS"). E.V. was placed with Elizabeth's aunt, Katie V., who also had custody of Elizabeth's two older children.

¶ 6    After a hearing on May 4, 2023, the circuit court entered an adjudication order finding that E.V. was abused or neglected due to a lack of care and an injurious environment. The court also entered a disposition order adjudicating E.V. as a ward of the court, finding Elizabeth unable for some reason other than financial circumstances alone to care for, protect, train or discipline E.V. The court found that it was in the best interest of E.V. to remove her from the care of Elizabeth. The court found that reasonable efforts had been made to prevent or eliminate the need for removal of the minor from the home, but were unsuccessful. The circuit court entered a permanency order setting a goal to return E.V. to Elizabeth within 12 months, finding that Elizabeth had made "some progress" towards E.V.'s return home.

¶ 7    On November 6, 2023, the circuit court entered a permanency order finding that Elizabeth had not made substantial progress towards E.V.'s return home. The court kept the same permanency goal of returning E.V. home within 12 months. Elizabeth was allowed supervised visits with E.V. After a permanency hearing on June 11, 2024, the circuit court entered a new permanency order which changed the goal to "substitute care pending court determination on termination of parental rights."

¶ 8    In July 2024, the State filed a petition for termination of Elizabeth's parental rights. The petition alleged that Elizabeth was unfit as a parent on the grounds that (1) she failed to maintain a reasonable degree of interest, concern, or responsibility as to E.V.'s welfare under 750 ILCS 50/1(D)(b) (West 2024) (hereinafter, "ground (b)"); and (2) she failed to make reasonable efforts

to correct the conditions that were the basis for E.V.'s removal or failed to make reasonable progress towards the return of E.V. during any nine month period under 750 ILCS 50/1(D)(m) (West 2024) (hereinafter, "ground (m)"). Prior to trial, the State filed an amended pleading specifying the nine month periods for ground (m) as May 4, 2023 to February 4, 2024 (hereinafter, "Period 1") and February 4, 2024 to November 4, 2024 (hereinafter, "Period 2").

¶ 9　　A.　　Fitness Hearing

¶ 10　　The circuit court proceeded to a fitness hearing held over four dates between December 2024 and April 2025. Prior to any testimony, the State asked the circuit court to take judicial notice of the prior orders in the case and the petition for termination of parental rights. The State also admitted Elizabeth's Integrated Assessment, three service plans from June 2023, December 2023, and June 2024, Elizabeth's records from South Suburban Council and her drug test results as exhibits. The service plans recommended that Elizabeth complete individual therapy, parenting education classes, a psychiatric evaluation, and a substance abuse assessment along with any treatment recommendations. The Integrated Assessment noted that Elizabeth's two other children were removed from her care in early 2020 because of Elizabeth's drug use and she transferred guardianship of them to her aunt, Katie V.

¶ 11　　Danielle Watson testified that she worked as a Child Welfare Specialist with Lutheran Child and Family Services ("LCFS"), and was assigned to E.V.'s case in May 2023. At that time, Elizabeth had not completed individual therapy, a substance abuse assessment and treatment, random drug screening, parenting education and coaching, or a psychiatric evaluation. Elizabeth was referred to LCFS for individual therapy, but was unsuccessfully discharged from that therapy in September 2023 due to nonattendance. In October 2023, Watson referred Elizabeth to individual

therapy at Josselyn Agency, but Elizabeth never attended. Watson also referred her to LCFS and Elizabeth re-engaged in that therapy in November 2023, but did not successfully complete it and was discharged because she moved to Indiana in the spring of 2024.

¶ 12 Elizabeth had an outstanding referral for parenting education at Easter Seals Parenting Breakthrough in May 2023. Elizabeth never completed the program and was discharged due to attendance issues, having attended only one of the ten sessions and because the class ended in October 2023. Watson made an additional referral for Elizabeth to take parenting education classes through LCFS, which Elizabeth successfully completed in March 2024. Watson referred Elizabeth to parenting coaching with LCFS, but Elizabeth did not begin the program before she moved out of Illinois. Watson explained that Elizabeth was unable to complete parenting coaching prior to leaving the state because LCFS did not have any staff available in Elizabeth's area whose schedule worked with Elizabeth's visitation schedule.

¶ 13 Watson testified that Elizabeth received referrals for substance abuse assessment and treatment at Gateway Foundation in April and again in August of 2023, but she never engaged with substance abuse treatment there. In October 2023, Watson referred Elizabeth to South Suburban Counseling for substance abuse assessment and treatment. Elizabeth completed an assessment with South Suburban Counseling, which recommended outpatient treatment. Elizabeth declined such outpatient treatment. Watson did not make any additional referrals for substance abuse treatment, though she was aware that Elizabeth sought treatment from Recovery Works in Indiana. Watson spoke with Elizabeth's provider at Recovery Works and learned that Elizabeth was recommended for intensive inpatient treatment. However, Elizabeth was dismissed from the

program when she came to class smelling like THC. To Watson's knowledge, Elizabeth never engaged in inpatient substance abuse treatment.

¶ 14    Watson referred Elizabeth to Family Guidance for random toxicology screens. The State admitted these toxicology results into evidence. The records show that Elizabeth was scheduled to take 30 random drug screens between April 2023 and June 2024. Of those screens, Elizabeth failed to appear or complete the test 17 times, and tested positive 10 times for THC, 4 times for cocaine, and 1 time for opiates. She tested positive for cocaine October 18, 2023, cocaine and opiates on February 16, 2024, cocaine on February 28, 2024 and cocaine on May 3, 2024. Elizabeth only provided one drug screen that was negative for all substances, which occurred on June 7, 2024. No further drug drops were scheduled once the goal changed June 11, 2024 to termination. Watson testified that when she first met with Elizabeth, she told Elizabeth that failing to attend a drug screen was "considered a dirty drop."

¶ 15    In May 2023, Elizabeth had weekly, 2 hour, supervised visits with E.V. Watson began supervising those visits in November 2023. Watson could not recommend unsupervised visits due to Elizabeth's failure to complete services and her positive drug tests. Elizabeth informed Watson that she was pregnant again in the spring of 2024. Watson testified that LCFS recommended that the permanency goal be changed to termination of parental rights because Elizabeth did not comply with recommended services, she was unable to test negative for drugs and she used drugs while pregnant. As of February 2024, Elizabeth had not completed any of her recommended services.

¶ 16    On cross-examination, Watson acknowledged that, once the permanency goal changed to termination of Elizabeth's parental rights, LCFS stopped providing services. Watson was aware that, during the summer of 2024, Elizabeth sought treatment with NorthShore in Indiana. Elizabeth

arranged treatment with both Recovery Works and NorthShore herself because LCFS could not provide services while Elizabeth lived in Indiana. Watson acknowledged that Elizabeth was placed on the waitlist for parenting coaching after completing parenting classes, but she was not given an opportunity to complete coaching before the goal change in June 2024. Watson agreed that all supervised visits that Elizabeth had with E.V. went well and LCFS missed a few visits that had not been rescheduled. Since the goal changed to terminating Elizabeth's parental rights, Elizabeth only had monthly visits with E.V. Watson acknowledged that she failed to notify Elizabeth of a few random drug drops, but did not recall the exact dates when that occurred. Elizabeth did not provide Watson with any letters or certificates of completion of any services in Indiana.

¶ 17    Bruce Jones testified that he worked as a substance abuse therapist at Pinnacle Treatment Centers in Merrillville, Indiana. He provided individual and group substance abuse therapy for Elizabeth beginning in March 2024. Jones testified that when Elizabeth appeared at Recovery Works on May 9, 2024 for a group therapy session, he "smelled marijuana on her person." He did not allow Elizabeth to attend the session because "it would trigger other people" in the group. Jones testified that he recommended an inpatient program for Elizabeth because he "thought she needed a higher level of care *** to help her stay clean and sober." He explained that this was because she had positive drug screening results and "she did not appear to be improving." Jones stated that Elizabeth was noticeably pregnant during her treatment and he had concerns that she was using marijuana while pregnant.

¶ 18    Beth Noel testified on Elizabeth's behalf. Noel stated that she was a therapist and Director of Behavioral Health at NorthShore Health Centers. She had worked with Elizabeth as a patient since August 2024 after Elizabeth reached out for therapy services. Noel used dual diagnosis

therapy with Elizabeth, which combined aspects of mental health and substance use disorder therapy. Noel had not spoken with Elizabeth's DCFS caseworker, did not receive any inquiry from the caseworker, and had not reviewed Elizabeth's service plan or any of Elizabeth's records prior to August 2024. Elizabeth actively scheduled care with Noel and only missed one session. Noel testified that she never observed Elizabeth under the influence of drugs. Noel testified that Elizabeth participated in random drug and alcohol screens while under Noel's care. Elizabeth tested negative on each test from September-November 2024. No documentation of those drug screens was admitted into evidence.

¶ 19 Noel testified regarding her process of assessing patients and creating an individualized treatment plan. Elizabeth's treatment plan included goals of sobriety, addressing Elizabeth's mental health concerns, and recovery and relapse prevention. Noel testified that she felt that dual diagnosis treatment was the most effective treatment for Elizabeth. Noel also discussed how she applied this treatment method to address Elizabeth's specific needs. She felt Elizabeth was making progress with therapy, but she had not yet created a relapse prevention plan.

¶ 20 Heather Bright, a therapist at LCFS, testified that she worked with Elizabeth from December 2023 through August 2024. Bright held individual weekly therapy sessions with Elizabeth. She discussed the goals of Elizabeth's treatment and stated that Elizabeth met her treatment goals by the time they stopped working together. She testified that Elizabeth did not have a stable housing situation at the time treatment began, but when they concluded in August 2024, Elizabeth's "living situation seemed to improve significantly." She provided substance abuse counseling, but that was not part of her treatment goals with Elizabeth. Bright did not know Elizabeth had positive drug tests during their treatment. Bright identified a closing report that she

created when Elizabeth's treatment was terminated due to her move to Indiana, which was admitted into evidence.

¶ 21　Sabrina Hornack testified that she had been friends with Elizabeth for approximately five years, and Elizabeth had lived in Hornack's home in Gary, Indiana since the spring of 2024. A total of six people lived in the home: Hornack, Hornack's girlfriend, two of Hornack's girlfriend's children, Elizabeth, and Elizabeth's youngest daughter, A.V., who was born in July 2024. Hornack testified that she was a registered nurse and had experience with patients under the influence of drugs. Hornack witnessed Elizabeth under the influence of drugs before Elizabeth moved in to the home, but had not seen her under the influence since she moved in.

¶ 22　Hornack testified that she discussed the ongoing custody proceedings with Elizabeth, and observed Elizabeth hold herself more accountable and follow through with furthering her education and attending appointments. Hornack testified that she had multiple conversations with Elizabeth since July 2024 "regarding her change of attitude and general outlook." She stated that there was "some progress" prior to July, but "it was a little more stagnant in the first few months" that Elizabeth lived with her. She and Elizabeth discussed a relapse prevention plan which they finalized in August 2024. The plan was that, if Elizabeth relapsed, "she would give up caring for the children and go into an inpatient facility for treatment." On cross-examination, Hornack acknowledged that she was aware that Elizabeth tested positive for cocaine in May 2024.

¶ 23　Elizabeth testified that, in December 2022, she was in "a domestic violence situation" and was living in hotels with E.V. She stated that she was "drug-free" at the time of her testimony and had cut off contact with "that individual" for over a year. She was currently in recovery from substance abuse of cocaine and opiates and was receiving treatment at NorthShore. She relapsed

in February 2024 when she used heroin and cocaine, but stated that she did not have any relapses since then. However, she admitted that she tested positive for cocaine in October 2023, twice in February 2024, and in April and May 2024. She was attending Narcotics Anonymous meetings and therapy with Noel to avoid relapses.

¶ 24    Elizabeth had seen three substance abuse treatment providers since E.V. was taken into state custody. She started at South Suburban, but she did not complete treatment. She then received treatment at Recovery Works from May to June of 2024 with Jones, but did not complete treatment. She did not believe the treatment at Recovery Works was effective for her because Jones "was very biased on his opinion of addiction" and she "needed someone that was more versatile" in trauma and dual diagnosis. Elizabeth acknowledged that she missed random drug drops during the pendency of this case. Elizabeth testified that she missed some drops because Watson forgot to tell her about them or told her the wrong dates and times, but she acknowledged that there were times where Elizabeth "just did mess up."

¶ 25    Elizabeth testified that she currently lived with Hornack in Gary, Indiana. She was not given a time limit for how long she could stay with Hornack, but was told she had to stay clean, not talk to her "abusive ex," and be enrolled in school or working. She started therapy and drug treatment at NorthShore with Noel. Elizabeth was diagnosed with bipolar disorder, borderline personality disorder, ADHD, depression, and insomnia, and was seeing a psychiatrist who helped her manage those conditions with medication. Elizabeth discussed her therapy with Bright and Noel, and how she implemented what she learned in therapy.

¶ 26    Elizabeth also testified about her efforts to complete parenting classes and stated that she completed that class with LCFS. She stated that she used what she learned in parenting classes

during her visits with E.V. She tried to set up parenting coaching for her visits with E.V., but DCFS was unable to arrange it because her visits with E.V. occurred in a public place. Elizabeth stated that, during her visits, E.V. was happy to see her and gave her a hug every time. After A.V. was born in July 2024, Elizabeth began taking A.V. to the visits. Elizabeth stated that, during visits between December 2024 and February 2025, E.V. told her "[t]hat she could not give me hugs or kisses" because Katie V. told E.V. not to. Elizabeth testified that she wanted more visiting time and asked for more time. She was not allowed to call E.V. between visits, but would do so if she were allowed.

¶ 27    On cross-examination, Elizabeth acknowledged that she had multiple positive drug tests for cocaine during this case. She also acknowledged that she tested positive for marijuana multiple times after she moved to Indiana, including in March, May and June 2024, and was aware that marijuana was illegal in Indiana. She denied that Recovery Works recommended that she receive inpatient substance abuse treatment. She agreed that she began seeing Noel after LCFS stopped providing services in June 2024 and the goal changed to termination of her parental rights.

¶ 28    After closing arguments, the circuit court ruled orally that the State met its burden by clear and convincing evidence that Elizabeth was unfit based on ground (b) and both periods for ground (m). The court found that Watson testified credibly regarding Elizabeth's lack of progress toward reunification and lack of effort to correct the conditions that caused E.V. to be taken from her care. The Integrated Assessment and Service Plan corroborated her testimony.  The court found that Watson made multiple referrals and re-referrals to Elizabeth for services including individual therapy substance abuse treatment, random urine drops, parenting education and coaching and a psychiatric evaluation that were either declined or not completed successfully. The court found

that Elizabeth was unsuccessfully discharged from individual therapy in 2024 "due to her relocating to Indiana without telling the caseworker or agency." Elizabeth had several positive drug tests and failed to take many other drug tests. She did not complete substance abuse treatment or parenting coaching.

¶ 29   The circuit court also held that, since Elizabeth did not begin treatment with Noel until August 2024, it was only relevant for the last three months of Period 2 of ground (m) and a short portion of the relevant period for ground (b). It found that Noel's testimony did not connect Elizabeth's efforts in therapy to any progress towards the return home of E.V., or to Elizabeth's interest, concern, or responsibility for E.V.'s welfare. The court also noted that Noel was not provided any information regarding E.V.'s case, including the service plan, Integrated Assessment or service provider documents, to be able to say that she was providing therapy specifically to address progress toward reunification or correcting conditions that brought E.V. into care.

¶ 30   The court commended Elizabeth for making the progress she made, but could not "impute her current progress to a different time or for separate reasons." It found that Hornack's testimony "essentially amounted to character evidence" which was "not relevant for unfitness." Hornack's testimony regarding any efforts to correct the conditions that brought E.V. into care or progress towards return home was "nonexistent." The court noted that, while Elizabeth asserted that LCFS failed to contact her or provide services such as parenting coaching, "responsibility cannot be completely shifted on to an agency or a caseworker." The court concluded that the State proved by clear and convincing evidence that Elizabeth failed to make reasonable progress during either Period 1 or Period 2 and failed to make efforts to correct the reasons this case came into the system

or progress toward reunification. It acknowledged that Elizabeth made "some progress" during Period 2, but found that it was not reasonable progress towards reunification.

¶ 31    B.    Best Interest Hearing

¶ 32    The matter proceeded immediately to a best interest hearing. Lindsey Folk testified that she was a licensed clinical professional counselor with Zaborac Counseling Group. Folk began providing therapy to E.V. in February 2024. Katie V. paid for the therapy. Folk learned from Katie V. that the reason that E.V. was brought in for counseling was "separation anxiety" and "overall transitional issues."

¶ 33    Folk used "play therapy" with E.V., which Folk described as "a way to use different accessories, toys, games, art and things to help them either express themselves, act out situations *** it's a way for them to communicate what's kind of going on with them in their lives." Folk discussed how this was implemented with E.V. Folk observed that E.V. had members of her foster family represented in her play, but not Elizabeth. Folk stated that, in her opinion, this suggested that E.V. lacked a connection with Elizabeth.

¶ 34    Folk testified that she would ask if E.V. had a visit with Elizabeth, and on one instance, E.V. stated that she did not want to go to the visit. When Folk asked why, E.V. stated that "my mom was not allowed to go," referring to Katie V. Folk testified that, in her opinion, this showed that E.V. was not connected with Elizabeth. Folk testified that E.V. made progress during therapy, specifically through a reduction of anxiety symptoms and progress with potty training. Folk testified that, in her opinion, the termination of Elizabeth's relationship with E.V. would not be harmful to E.V.

¶ 35    Folk had family sessions with E.V. and Katie V. and observed the two as having "a very loving relationship" and that "[E.V.] seems incredibly comfortable with [Katie V.]" Folk testified that E.V. originally referred to Katie V. as "momma Katie" but eventually just started calling her "momma." In Folk's opinion, ending the relationship between E.V. and Katie V. would be harmful to E.V. On cross-examination, Folk acknowledged that she had never spoken with Elizabeth or Watson or reviewed Elizabeth's service plan and had not ever observed E.V. outside of her office.

¶ 36    Watson testified that E.V. had been placed with Katie V. since the case began. Watson observed E.V. in Katie V.'s home and found that the home appeared safe and appropriate with no signs of abuse or neglect. E.V.'s medical records were up to date and Katie V. took E.V. to all appointments. Watson described E.V. and Katie V.'s interactions as "positive." Watson testified that Katie V. met all of E.V.'s needs. Katie V. told Watson that she was seeking to adopt E.V. E.V. never told Watson that she wanted additional visits with Elizabeth. Watson stated that her agency recommended the termination of Elizabeth's parental rights with adoption as the permanency goal.

¶ 37    On cross-examination, Watson stated that Elizabeth and E.V. are "[s]ort of" bonded. Watson saw E.V. interact with A.V. during visits, and E.V. "just looks at" A.V. Watson acknowledged that multiple "contact notes" documenting Elizabeth's visits with E.V. that described E.V. as excited to see Elizabeth. Elizabeth admitted into evidence multiple contact notes from other aides who supervised visits that Watson did not attend, which contained observations of positive interactions between Elizabeth and E.V. Watson acknowledged that she had never told E.V. that it was possible she may never see Elizabeth again.

¶ 38    Katie V. testified that she was E.V.'s great aunt, and E.V. had lived with her since January 2023. She also cared for two of E.V.'s older sisters, though the oldest recently moved in with her

father. Katie V. took E.V. to all appointments and followed recommendations made by health care providers. Katie V. stated that if Elizabeth's parental rights were terminated, she would want to adopt E.V. On cross-examination, Katie V. stated that she had not had contact with Elizabeth since 2020. She denied telling anyone at LCFS that she did not want contact with Elizabeth. She acknowledged that she did not invite Elizabeth to birthdays or holiday gatherings.

¶ 39    The circuit court took judicial notice of Hornack's testimony during the fitness hearing. Hornack additionally testified that she told Elizabeth that E.V. could stay in her home if Elizabeth regained custody of E.V.

¶ 40    Elizabeth testified regarding her most recent visit with E.V., where E.V. gave her a hug and they unwrapped E.V.'s Easter basket, which included items from E.V.'s favorite television show. Elizabeth stated that E.V. and A.V. had positive interactions with each other and E.V. referred to herself as a "big sister" of A.V. Elizabeth testified that she had visits once a week during the first half of 2024, but changed to once a month in the second half of 2024. After the visits became less frequent, E.V. was still "lovey," but did not call her "Mom" anymore. Elizabeth testified that she sent E.V. gifts to Katie V.'s house for most holidays and birthdays, but E.V. would say that she never received the gifts. Elizabeth stated that she tried to facilitate a relationship between E.V. and A.V., as well as E.V.'s oldest sibling. Elizabeth stated that she was "really trying" and "just couldn't imagine not ever seeing [E.V.] again."

¶ 41    After closing arguments, the circuit court issued an oral ruling finding that the State met its burden to show that it was in the best interest of E.V. to terminate Elizabeth's parental rights. The court stated that it considered the factors set forth in the Juvenile Court Act, including E.V.'s safety and welfare, development, familial background, attachments, love and security, familiarity,

continuity of relationships with parent figure, any expression of her wishes, her community ties, her need for permanence, the uniqueness of the family and child, the risks of substitute care, and the preferences of the foster parent. See 705 ILCS 405/1-3(4.05) (West 2024). The court found that Watson testified credibly that Katie V. provided a safe and appropriate home for E.V., that E.V.'s needs were met and they had a mutually loving relationship. The court observed that Katie V. also cared for a biological sibling of E.V., with whom E.V. had a strong relationship. The court credited Watson's testimony that there was no observable bond between E.V. and A.V. during visits. The court acknowledged that the case notes from other DCFS aides included positive interactions between Elizabeth and E.V., but noted that none of those witnesses testified. The court found no testimony presented that E.V. had any significant emotional response from separating with Elizabeth and that any evidence of positive interactions between E.V. and Elizabeth during visits was not "compelling" enough to outweigh the evidence regarding the bond between E.V. and Katie V. The court stated that Folk provided some insight into E.V.'s development and observable bonds between E.V. and Katie V. It was not in E.V.'s best interest to disrupt her life and the bond with Katie V. and her sibling. The circuit court entered a written termination hearing order and a permanency order terminating Elizabeth's parental rights and setting the goal as adoption. This appeal follows.

¶ 42    II.    ANALYSIS

¶ 43    On appeal, Elizabeth argues that (1) the finding at the fitness hearing that she lacked reasonable interest, concern, or responsibility for E.V. was against the manifest weight of the evidence; (2) the findings at the fitness hearing that she failed to make substantial progress towards E.V.'s return during Period 1 and Period 2 were against the manifest weight of the evidence; (3)

any finding of unfitness based solely on Period 1 of ground (m) is unconstitutional as applied to Elizabeth, as she was fit at the time of trial; and (4) the finding at the best interest hearing that the termination of her parental rights was in E.V.'s best interest was against the manifest weight of the evidence.

¶ 44    "In Illinois, the authority to involuntarily terminate parental rights is purely statutory and the scope of the court's authority is defined by the Juvenile Court Act and the Adoption Act." *In re E.B.*, 231 Ill. 2d 459, 463 (2008). Illinois has a policy which "favors parents' superior right to the custody of their own children." *Id.* at 464. Section 2-29 of the Juvenile Court Act provides for a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2024). "First, the court must find, by 'clear and convincing evidence, that a parent is an unfit person as defined in Section 1 of the Adoption Act.'" *In re J.L.*, 236 Ill. 2d 329, 337 (2010) (quoting 705 ILCS 405/2-29(2) (West 2008)). "Second, once a finding of parental fitness is made under section 1(D) of the Adoption Act, the court considers the 'best interest' of the child in determining whether parental rights should be terminated." *Id.*

¶ 45    A.    Fitness

¶ 46    Section 1(D) of the Adoption Act sets forth eighteen separate grounds under which a parent can be found unfit. 750 ILCS 50/1(D) (West 2024). A finding of unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re A.M.*, 2025 IL App (1st) 250467, ¶ 36. The court's finding of unfitness is against the manifest weight of the evidence only when "the opposite conclusion is clearly apparent or if the finding itself is unreasonable, arbitrary, or not based on the evidence." *Id.* Only one ground of unfitness needs to be proven in order to find a parent unfit. *Id.* ¶ 51. "We give great deference to the trial court's finding of unfitness, defer to the

trial court's factual findings and credibility assessments, and will not re-weigh the evidence anew on appeal." *In re J.B.*, 2014 IL App (1st) 140773, ¶ 49.

¶ 47    We first address the trial court's finding that Elizabeth was unfit based on ground (b). Ground (b) allows for a finding of unfitness if the parent exhibits a "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2024). This section is viewed in the disjunctive, such that any of the three elements (interest, concern, or responsibility) may be considered on its own as a basis to find a parent unfit. *In re J.B.*, 2014 IL App (1st) 140773, ¶ 51. "[P]etitions alleging unfitness pursuant to section 1(D)(b) are not statutorily limited to a specific time frame." *Id.* ¶ 52. The court must consider the parent's "reasonable efforts" and any barriers the parent may experience in showing interest in the minor, but those efforts "must be objectively reasonable." *Id.* ¶ 51. However, "simply demonstrating some interest or affection toward a child does not make a parent fit or their efforts reasonable." *Int. of Y.F.*, 2023 IL App (1st) 221216, ¶ 34.  A parent can be found unfit under ground (b) based on failing to comply with an imposed service plan, a continuing drug addiction and failing to obtain treatment for the addiction, or infrequent or irregular visitation.  *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004).

¶ 48    The court found that the fact that Elizabeth moved to Indiana without providing notice to LCFS indicated a lack of interest and concern for E.V. The court also found that Elizabeth's failure to complete the service plan and participate in available services through most of the relevant time frame indicated a lack of responsibility and that Elizabeth did not meaningfully engage in services until after the permanency goal changed to termination of parental rights.

¶ 49     The evidence at the fitness hearing supported the circuit court's finding that Elizabeth was unfit based on ground (b). The evidence showed that while Elizabeth regularly attended supervised visits with E.V., she failed to progress from supervised visits to unsupervised visits because she failed to complete services and continually failed her drug tests.   Elizabeth's service plan recommended that she complete a substance abuse assessment and treatment, random drug screening, parenting education and coaching and a psychiatric evaluation.   The unfitness hearing took place more than two years after E.V. was removed from Elizabeth's care and during that time, the only service Elizabeth had completed was parenting classes.

¶ 50     Elizabeth's unsatisfactory progress with random drug drops also demonstrated a lack of interest, concern and responsibility for E.V. Between May 2023 and May 2024, she repeatedly missed random drug drops and tested positive for cocaine, heroin and/or THC.   She relapsed in February 2024 and then tested positive for cocaine as late as May 2024, nearly 1.5 years after E.V. was removed from her care and while she was pregnant with another child. She only provided one negative drug screen out of 30 urine drops.   She was removed from a group substance abuse therapy class in May 2024 because she smelled of marijuana. Elizabeth was referred for inpatient substance abuse treatment, but she declined inpatient treatment. She was frequently discharged from services unsuccessfully after she failed to attend.

¶ 51     Elizabeth argues that she ultimately engaged in services that achieved the desired results of treating her mental health struggles and addiction through Noel, and that any failure to meet specific aspects of the service plan were not relevant to whether she demonstrated interest, concern, or responsibility for E.V. However, the evidence supports the court's finding that Elizabeth failed to take responsibility to address the chief issue that led E.V. to come into the care of the State, her

addiction. See *In re Za. G.*, 2023 IL App (5th) 220793, ¶¶ 37-42 (affirming finding of unfitness based on ground (b) when the parent continued to use marijuana and failed to comply with random drug tests, even though parent completed all other services); *Int. of Y.F.*, 2023 IL App (1st) 221216, ¶ 38 ("[e]vidence of noncompliance with an imposed service plan, coupled with continued struggles to maintain sobriety, can support a finding of unfitness under ground (b)"). While Elizabeth made some progress at the very end of the period through therapy with Noel, and apparently provided negative drug screens, this did not occur until August 2024, after the goal changed to termination of parental rights and over a year and a half after E.V. was taken into DCFS custody. As stated, ground (b) has no time constraint that limits the court's consideration. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 50. Of the other services recommended in Elizabeth's service plan, she only completed parenting classes and made some progress with, but did not finish, individual therapy.

¶ 52 The record also reflects that Elizabeth was not transparent about her drug use to her service providers. Bright testified that she was not aware that Elizabeth had positive drug tests during the time that Bright treated Elizabeth between December 2023 and August 2024. Bright stated that if she had been aware of those positive tests, that was something she would have addressed with Elizabeth in therapy. That period includes multiple positive tests for cocaine and opiates, which Elizabeth apparently withheld from her therapy provider. Elizabeth also denied being referred for inpatient substance abuse treatment despite evidence suggesting that such a recommendation was made. This further demonstrates a lack of responsibility towards the return of E.V., given that Elizabeth's addiction was the main reason that E.V. was removed from her care, yet she was not honest about that addiction with her service providers. See *In re J.B.*, 2024 IL App (1st) 232242-

U, ¶¶ 25, 42 (affirming finding of unfitness based on ground (b) when parent was not "sufficiently honest or candid about the issues" that caused her child to be taken into the care of the State).

¶ 53    While we acknowledge Elizabeth's argument that progress in treating addiction is rarely linear and that Elizabeth was apparently drug-free for a few months before the unfitness hearing, we cannot find that her late progress outweighs her lack of responsibility demonstrated during the majority of the time E.V. was in the State's care. The circuit court's finding that Elizabeth's late efforts to improve her situation did not outweigh the evidence that she did not take appropriate responsibility towards the return of E.V. during the preceding 20 months was not against the manifest weight of the evidence.

¶ 54    Elizabeth also argues that the court failed to consider the context of her life in considering whether her actions were reasonable. She asserts that the court erred by holding some reasonable steps she took, such as moving to Indiana to obtain secure housing, against her by finding it demonstrated a lack of interest or concern. We cannot find that either of these considerations undermine the circuit court's finding of unfitness based on ground (b). While we agree with Elizabeth that her move to Indiana did result in housing stability, it also had the drawback of separating her from services that were recommended by LCFS, preventing her from completing or at least delaying completion of multiple services.

¶ 55    Elizabeth also argues that the circuit court erred by minimizing the testimony of Noel and Hornack. On appeal, we defer to the circuit court's determination of the appropriate weight to give to testimony of witnesses and we will not re-weigh the evidence. *In re J.B.*, 2014 IL App (1st) 140773, ¶ 49. The circuit court found that Noel's testimony was of minimal value because it had little connection to the ongoing custody case, particularly since Noel was unaware of Elizabeth's

service plan or other information regarding the case. Regarding Hornack, the circuit court characterized her testimony as "character evidence" and found that it had little value besides demonstrating that Elizabeth had obtained stable housing. The circuit court's findings are supported by the testimony at the fitness hearing. Noel testified that Elizabeth did not provide her with any information about the ongoing custody proceedings, and while Hornack provided Elizabeth with housing, the rest of her testimony largely centered around her perception of Elizabeth's efforts to improve her situation after the goal changed to terminating Elizabeth's parental rights. We cannot find that the relative weight given to these witnesses' testimony was arbitrary or not supported by the evidence. *In re A.M.*, 2025 IL App (1st) 250467, ¶ 36.

¶ 56 Ultimately, the evidence at the fitness hearing supports the circuit court's finding that the State proved by clear and convincing evidence that Elizabeth failed to demonstrate responsibility for the return of E.V. and that Elizabeth's uptick in interest after the goal changed to termination of parental rights did not outweigh her demonstrated lack of responsibility prior to the goal change.

¶ 57 As we may affirm the court's finding that Elizabeth was unfit on any ground, we need not address Elizabeth's arguments regarding ground (m), including her constitutional argument. *In re A.M.*, 2025 IL App (1st) 250467, ¶ 51; see *In re S.G.*, 175 Ill. 2d 471, 480 (1997) ("A court should avoid constitutional questions where the case may be decided on other grounds.").

¶ 58 B. Best Interest

¶ 59 Elizabeth next argues that the circuit court's order finding that it was in E.V.'s best interest to terminate Elizabeth's parental rights was against the manifest weight of the evidence. Once the court determines that a parent is unfit, the matter proceeds to a best interest hearing. *In re M.I.*, 2016 IL 120232, ¶ 20; 705 ILCS 405/2-29(2) (West 2024). At the best interest stage, the court

considers factors in the context of the child's age and developmental needs, including (1) the physical safety and welfare of the child; (2) the development of the child's identity; (3) the child's background and familiar, cultural, and religious ties; (4) the child's sense of attachments, including "where the child actually feels love, attachment and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued)," the child's sense of security and familiarity, continuity of affection for the child and the least disruptive placement alternative for the child; (5) the child's wishes and long-term goals; (6) the child's community ties, including schooling; (7) the child's need for permanence including stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child, including willingness to provide permanency through guardianship or adoption. 705 ILCS 405/1-3(4.05) (West 2024). No single factor is dispositive. *In re Mo. J.*, 2026 IL App (1st) 251573, ¶ 86.

¶ 60    The State must prove that the termination of the respondent's parental rights is in the best interest of the child by a preponderance of the evidence. *In re. D.T.*, 212 Ill. 2d 347, 366-67 (2004). The circuit court's best interest determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re A.M.*, 2025 IL App (1st) 250467, ¶ 66. The court's best interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *In re Mo. J.*, 2026 IL App (1st) 251573, ¶ 84. "There is a strong and compelling presumption in favor of the result reached by the trial court in child custody cases." *Id.*

¶ 61    For the best interest determination, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re J.V.*, 2018 IL App (1st) 171766, ¶ 249 (citing *In re Curtis W., Jr.*, 2015 IL App (1st) 143860, ¶ 52). The child's best interest is superior to all other factors, including the interests of the biological parents. *Id.* A reviewing court need not rely on any basis used by the trial court below in affirming its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 62    Here, the court expressly considered all of the factors in the Act and found that they supported terminating Elizabeth's parental rights. The court found that Katie V. provided E.V. with a safe and appropriate home and that E.V. would benefit from maintaining the bond with Katie V. and her sibling with whom she had a strong relationship. The court noted that E.V. called Katie V. "Mommy" and had a "mutually loving relationship" with her. The court found that Folk and Watson testified credibly about their observations of E.V.'s relationship with Katie V., and specifically credited Watson's testimony that there were no observable bonds between E.V. and A.V. when Elizabeth brought A.V. to visits. The court found that any evidence of strong bonds between E.V. and Elizabeth were based on observations by individuals who did not testify, and that they were not "compelling enough to outweigh" the evidence regarding the bond between E.V. and Katie V., which was observed firsthand by Watson.

¶ 63    We cannot find that the court's finding regarding E.V.'s best interest was against the manifest weight of the evidence. The court was presented with evidence that E.V. had a loving relationship with Katie V., was placed with one of her older siblings, and that all her basic needs were met. While the preferences of a child as young as E.V. may not be entitled to much weight, Folk testified that E.V. expressed some preference towards spending more time with Katie V.,

even stating that she did not want to go to a visit with Elizabeth because Katie V. could not come. E.V. never asked for additional visits with Elizabeth. Her visits with Elizabeth were more of a "playtime relationship" and not a mother-daughter relationship like E.V. and Katie V. While Elizabeth had made some progress in her own life by the time of the best interest hearing, we cannot find that her progress alone undermines the court's best interest finding given the evidence presented as to E.V.'s relationship and well-being.

¶ 64    Elizabeth argues that the circuit court did not properly apply the factors set forth in the Juvenile Court Act and improperly weighed E.V.'s bond with Elizabeth against E.V.'s bond with Katie V. We disagree. First, in announcing its decision, the circuit court expressly listed the factors of the Juvenile Court Act and discussed the evidence in light of those factors. 705 ILCS 405/1-3(4.05) (West 2024).  Second, we note that the bond between Katie V. and E.V. is relevant to multiple best interest factors set forth in the Juvenile Court Act, including the child's attachments, the wishes of the child, the need for permanence, the least disruptive placement alternative for the child and the preferences of the persons available to care for the child. See *id.* While the court did discuss whether E.V.'s bond with Katie V. outweighed the bond with Elizabeth, the record does not reflect this was the sole basis of the court's best interest finding or that this factor was given undue weight. Further, "the court may consider the nature and length of the child's relationship with her present caretaker and the effect that a change in placement would have upon her emotional and psychological well-being." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 65    Elizabeth also argues that her bond with E.V. was "a product of how the relationship was structured by child welfare personnel." She argues that the court ignored evidence that E.V. was excited to see Elizabeth during visits and that there was some evidence that E.V. "had been told

by the authority figure in her life to stop showing affection to her mother." The circuit court did not ignore this evidence, as it acknowledged that there was conflicting evidence regarding E.V. and Elizabeth's relationship. In the court's ruling, it acknowledged there was evidence of positive interactions between E.V. and Elizabeth, but weighed that evidence against the evidence that Katie V. met E.V.'s needs and the strength of E.V.'s bond with Katie V.

¶ 66    Elizabeth next argues that the court's finding that E.V. and A.V. had no significant bond was "wrong," citing Elizabeth's testimony regarding their interactions. However, the court also heard testimony from Watson that E.V. "just looked at" A.V., and specifically credited Watson's testimony. The circuit court, as trier of fact, was in a superior position to evaluate the relative credibility of the witnesses, and we will not substitute our judgment for that of the circuit court. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). Additionally, the court acknowledged that it was "understandable" that there was not a strong bond between the two, given that A.V. was less than a year old at the time of trial.

¶ 67    Elizabeth next contends that the court failed to consider Elizabeth's ability to parent at the time of the best interest hearing, pointing out that she had been sober for "many months," had stable housing, and was able to parent A.V. without any apparent state intervention. However, the court considered the evidence that Elizabeth had "a long period of time to reunify" and that E.V. was "in a loving home and has been for quite some time." We cannot find that this assessment of the evidence, that E.V. had a solid bond with Katie V. while Elizabeth was unable to complete services and failed to progress towards reunification, was not warranted based on the evidence presented.

¶ 68    Next, Elizabeth argues that the circuit court failed to consider that there was no evidence that Elizabeth's "continued contact with E.V. would be harmful to E.V." She argues that "[a]bsent evidence that [Elizabeth's] relationship with E.V. causes her any harm, the trial court never [should] have considered legally terminating that relationship." Elizabeth cites no authority to suggest that a lack of harm in maintaining the parent-child relationship is a factor that should be considered before terminating parental rights. Therefore, this argument is forfeited. See Ill. Sup. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *People v. Macias*, 2015 IL App (1st) 132039, ¶ 88 ("Contentions supported by some argument, but no authority do not meet the requirements of Supreme Court Rule 341(h)(7)" and are forfeited).

¶ 69    Lastly, Elizabeth contends that the circuit court failed to consider the harm that termination of parental rights causes and failed to consider alternatives such as private guardianship. She observes that the Kinship in Demand Act recently amended the Juvenile Court Act to place adoption and private guardianship on equal footing. See Pub. Act 103-1061 (eff. Feb. 5, 2025) (amending 705 ILCS 405/2-28(2.3)); *In re A.M.*, 2025 IL App (1st) 250467, ¶ 69 ("The amendment to section 2-28 of the Juvenile Court Act does not express a preference for guardianship over termination of parental rights but rather sets the two options on equal footing."). Elizabeth argues that a guardianship would have served E.V.'s needs better by preserving her relationship with Elizabeth as well as E.V.'s relationship with her siblings across two households.

¶ 70    Elizabeth essentially argues that because guardianship was a better option, the circuit court's order terminating her parental rights is against the manifest weight of the evidence. However, our standard of review is not to determine the best option *de novo*, but rather to determine whether the circuit court's findings regarding the best interest of E.V. are against the

manifest weight of the evidence. *In re Mo. J.*, 2026 IL App (1st) 251573, ¶ 84. As we cannot find that the "opposite conclusion is clearly apparent," we cannot find that the circuit court's conclusion that it was in E.V.'s best interest to terminate Elizabeth's parental rights is against the manifest weight of the evidence. *Id.*

¶ 71    For the foregoing reasons, we affirm the orders of the circuit court.

¶ 72    Affirmed.